IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                            Criminal Case No. 3:26cr1

LARRY DONTE BARNHART,

   Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Larry Donte Barnhart's Motion to

Suppress (the "Motion to Suppress" or "Motion"). (ECF No. 19.)[1]  In the Motion, Mr. Barnhart

moves to suppress a firearm seized during a search incident to his arrest as the fruit of an

unconstitutional arrest under the Fourth Amendment to the United States Constitution.  (ECF No.

19, at 1.)

On January 30, 2026, Mr. Barnhart filed the Motion.  (ECF No. 19.)  The United States

responded, (ECF No. 24), and Mr. Barnhart replied, (ECF No. 28).  On March 24, 2026, the

Court held a hearing concerning Mr. Barnhart's Motion.  (ECF No. 35.)  After the hearing, both

parties filed supplemental briefs.  (ECF Nos. 37, 38.)

This matter is ripe for disposition.  For the reasons articulated below, the Court finds the

suppression of the firearm inappropriate because the good-faith exception to the exclusionary

rule applies.  Even if the capias underlying the officers' arrest lacked probable cause such that

the firearm recovered through the search of Mr. Barnhart incident to his arrest were a fruit of the

poisonous tree, the arresting officers acted in reasonable reliance on the capias.  The Court will

deny the Motion.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

A.    **Factual Findings[2]**

1.    **Mr. Barnhart's State Conviction**

On July 28, 2011, Mr. Barnhart was convicted and sentenced in the Circuit Court of the County of Henrico (the "Henrico Circuit Court") on two charges of bank robbery in violation of Virginia Code § 18.2-58, and two charges of use of a firearm in the commission of a robbery in violation of Virginia Code § 18.2-53.1. (*See* ECF Nos. 35-2, 35-3.) The Honorable L.A. Harris of the Henrico Circuit Court for the County of Henrico ("Judge Harris") sentenced Mr. Barnhart to 38 years' imprisonment, with 30 years suspended, and ordered Mr. Barnhart to pay $7,546.99 in restitution. (*See* ECF No. 35-3, at 2.)

On November 21, 2018, Mr. Barnhart appeared before Judge Harris to arrange a restitution repayment plan. (*See* ECF No. 35-4.) At the hearing, Judge Harris "release[d]" Mr. Barnhart from probation, but ordered Mr. Barnhart to pay $75 per month in restitution starting on January 1, 2019. (ECF No. 35-4, at 6:24–8:1; *see* ECF No. 35-15, at 6.) Judge Harris also set the matter for a restitution review hearing on December 10, 2019.[3] (ECF No. 35-4, at 7:8–15.)

---

[2] The court bases its factual determinations on the testimony of Detective Quinton Barnes of the Richmond City Police Department at the March 24, 2026 hearing, (ECF No. 36), the exhibits admitted at the hearing, (ECF No. 35-1), and the exhibits attached to Mr. Barnhart's Motion, (ECF No. 19-1). Among other hearing exhibits, the Court relies upon the body camera footage taken from Detective Barnes and offered by the United States ("Body Cam").

Several of the exhibits accompanying Mr. Barnhart's Motion are duplicative of those admitted during the hearing. (*Compare* ECF No. 19-1 *with* ECF Nos. 35-6, 35-8, 35-10, 35-12, 35-13, 35-14.) Because the exhibits offered by Mr. Barnhart at the hearing are more comprehensive, the Court cites to those exhibits rather than those attached to Mr. Barnhart's Motion.

[3] Virginia Code § 19.2-305.1 governs "restitution for such property damage or loss." Several subsections govern when and how courts conduct hearings on the ordered restitution. *See* Va. Code § 19.2-305.1(F)(1)–(5).

2

### 2.    The Henrico Circuit Court Holds Restitution Review Hearings

#### a.    Mr. Barnhart Appears for His Restitution Review Hearings in 2019 and 2021

On December 10, 2019, Mr. Barnhart appeared before Judge Harris for his first restitution review hearing. (*See generally* ECF No. 35-5.) At the hearing, Judge Harris ordered Mr. Barnhart to continue on the previously-arranged monthly payment plan and set the case for another restitution review hearing on December 1, 2021.[4] (ECF No. 35-5, at 4:9–24.)

On December 1, 2021, while in state custody on a new charge, Mr. Barnhart appeared before Judge Harris for his second restitution review hearing. (*See generally* ECF No. 35-7.) Judge Harris again ordered Mr. Barnhart to continue on the payment plan and set the matter out for a restitution review hearing on December 5, 2023. (ECF No. 35-7, at 4:1–15; ECF No. 35-8.)

#### b.    Mr. Barnhart Does Not Appear for His Restitution Review Hearing in December 2023 and the Henrico Circuit Court Continues the Hearing

Mr. Barnhart did not appear for his restitution review hearing on December 5, 2023. (*See generally* ECF No. 35-9.) Assistant Commonwealth's Attorney Jeromy R. Lewis appeared on behalf of the Commonwealth of Virginia. (ECF No. 35-9, at 2.) Upon consultation with Mr. Lewis and the court clerk, Judge Harris determined that Mr. Barnhart was in compliance with his restitution payments. (ECF No. 35-9, at 3:2–17.) Because Mr. Barnhart was "doing all right," Judge Harris set the case out for another restitution review hearing on December 3, 2025. (ECF No. 35-9, at 3:16–4:2; ECF No. 35-10, at 1 (noting that Mr. Barnhart "was not present" for the December 5, 2023 hearing).)

---

[4] At this hearing, Judge Harris again "let [Mr. Barnhart] off of probation," (ECF No. 35-5, at 4:15–16), although it appears that Mr. Barnhart's probation was terminated in November of 2018, (ECF No. 35-4, at 8:19–24; ECF No. 35-15, at 6).

Following the hearing, Judge Harris issued a written order memorializing the December 3, 2025 restitution review hearing. (ECF No. 35-10.) The order stated, in relevant part:

> The Court, for the reasons stated to the record, hereby continues these matters to December 3, 2025, at 9:00 o'clock a.m., for a restitution review hearing.
>
> The Clerk is directed to forward an attested copy of this Order . . . to [Mr. Barnhart], 391 E. Beal Street, Highland Springs, VA 23075.

(ECF No. 35-10, at 1.)

Mr. Barnhart had moved from the Beal Street address in July of 2022, prior to the December 2023 restitution review hearing. (ECF No. 35-15, at 5 (noting that Mr. Barnhart's address of "391 E. Beal St, Highland Springs, VA 23075" had "[e]nded").) While this move is reflected in Mr. Barnhart's Henrico County Probation and Parole Records, (ECF No. 35-15, at 5), Mr. Barnhart was no longer on probation for the underlying offenses,[5] and nothing in the record before this Court indicates whether the Henrico Circuit Court was notified of Mr. Barnhart's move.

### c.    Mr. Barnhart Does Not Appear for His Restitution Review Hearing in December 2025 and Judge Linda Lambert Grants the Commonwealth's Request for a Capias

As in 2023, Mr. Barnhart did not appear for his subsequent restitution review hearing on December 3, 2025. (ECF No. 35-11, at 3:6–7 ("Mr. Barnhart is not present.").) Rather than Judge Harris, Henrico Circuit Court Judge Linda Lambert ("Judge Lambert") presided over the hearing. (ECF No. 35-11, at 1.) Assistant Commonwealth's Attorney Christopher Dorsey ("ACA Dorsey") was present on behalf of the Commonwealth of Virginia. (ECF No. 35-11, at

---

[5] Mr. Barnhart was on state probation at the time Judge Harris issued the December 5, 2023 Order for a separate, unrelated charge. (ECF No. 35-15, at 6 (noting that a Virginia state court placed Mr. Barnhart on probation on September 1, 2021 following conviction and sentence on new charges in August of 2021).)

2.) Neither Judge Lambert nor ACA Dorsey was present during the previous, 2023 restitution review hearing. (*See generally* ECF No. 35-9.) The December 3, 2025 hearing was brief and included only the following exchange:

> THE CLERK: This is Commonwealth of Virginia versus Larry Donte Barnhart, case number CR11-1243-, 1244[-], 1245[-], and 1246-00F.
>
> THE COURT: Good morning. Let the record reflect that we've just called the matter of Larry Barnhart at 10:38. This matter was set for the nine o'clock docket. Mr. Barnhart is not present. And we do have Mr. Dorsey present from the Commonwealth[']s Attorney's Office. Mr. Dorsey?
>
> MR. DORSEY: Judge, we were set for a restitution review this morning. It looks like the case was last in Court on December 5th of 2023 and carried out presumably two years to today's date. *At least the Commonwealth file looks like that the parties were present back on December 5th of '23 when this date would have been selected. So we'd ask the Court for a capias.*
>
> THE COURT: All right. The *Court will grant the Commonwealth's request for [a] capias* for Mr. Barnhart's failure to appear.
>
> MR. DORSEY: Thank you, Judge.
>
> THE COURT: Thank you, sir.

(ECF No. 35-11, at 3:1–21 (emphasis added).)

Following the hearing, a "draft" order (the "Draft Order") was docketed in Mr. Barnhart's underlying criminal case. (ECF No. 35-2, at 3 (listing a "Draft Order" on "12/03/25 @9AM").) Although the Draft Order included a signature line with Judge Lambert's name, it was unsigned and undated. (ECF No. 35-12, at 1.) Relevant to Mr. Barnhart's Motion, the Draft Order stated:

> On December 3, 2025, came Christopher Dorsey, the attorney for the Commonwealth, and Larry Donte Barnhart, . . . who was not present but stands convicted of and sentenced for four (4) felonies, to wit: robbery of a bank (Virginia Code Section 18.2-58) . . . and use of a firearm in the commission of a robbery (Virginia Code Section 18.2-53.1) . . . pursuant to the Court's Order entered December 14, 2023.

5

> Upon the defendant's failure to appear in Court this day, the Court orders that a Capias to Show Cause shall be issued . . . charging contempt of Court (Virginia Code Section 18.2-456(A)(6)), a misdemeanor, which shall be heard pending apprehension of defendant.

(ECF No. 35-12, at 1.)[6]

The same day, a Henrico Circuit Court clerk issued and docketed a capias to show cause (the "Capias") for Mr. Barnhart's arrest. (ECF No. 35-2, at 3; ECF No. 35-13, at 1.) The Capias included the following description of the charge:

> Be imprisoned for fail to appear in the Henrico Circuit Court on 12-03-05 for Robbery of Bank (18.2-58) in CR11-1243, 1244-00, and USA FA in FEL (18.2-53.1), in CR11-1245, 1246-00, creating Fail to Appear (18.2-456(A)(6), in CR25-4490-00.

(ECF No. 35-13, at 1 (capitalization omitted).)[7] Under the description of the charge, a checkbox indicating whether "supplemental document(s) [are] attached and incorporated" was blank. (ECF No. 35-13, at 1.) The Capias listed Mr. Barnhart's address as "200 E 9th St, Richmond, VA 23223."[8] (ECF No. 35-13, at 1.)

---

[6] In portions of the Draft Order not cited here, it states both that Mr. Barnhart "was not present" and "appeared in person." (ECF No. 35-12, at 1.) It is undisputed by the parties that Mr. Barnhart did not appear at the restitution review hearing on December 3, 2025, and this discrepancy appears to be a scrivener's error.

[7] "In Virginia[,] a capias is the functional equivalent of an arrest warrant." *United States v. Hickman*, No. 95-5165, 1996 WL 191937, at *1 n.1 (4th Cir. Apr. 22, 1996) (citing Va. Code § 19.2-80).

[8] Mr. Barnhart does not make clear *who* he believes issued the Capias—Judge Lambert or the court clerk. At times, he suggests that it was Judge Lambert. (*See* ECF No. 38, at 5 (stating that the "*issuing judge* uncritically accepted the Commonwealth[']s Attorney's sworn assertion"). But elsewhere, he argues that that the deputy clerk issued the Capias. (*See* ECF No. 28, at 7 (explaining that the "*clerk's decision* to issue [the] [C]apias in clear violation of the Fourth Amendment").) He also suggests that because Virginia trial courts "speak only through their written orders," (ECF No. 19, at 6 (quoting *Kitchen v. Upshaw*, 286 F.3d 179, 187 (4th Cir. 2002)), and Judge Lambert did not issue a *signed* written order until after the Capias was issued and Mr. Barnhart was arrested, the clerk necessarily issued the Capias, (ECF No. 19, at 6 ("[I]t is irrelevant that a judicial order entered after the fact, because at the time the capias issued, no

### 3.      Richmond Police Arrest Mr. Barnhart on the Capias

On the evening of December 6, 2026, Richmond Police Department Detectives Quinton Barnes and Namar Brown ("Detective Barnes" and "Detective Brown," respectively) were on patrol in Gilpin Court in Richmond, Virginia. (ECF No. 36, at 5:22–6:9.) As part of their routine patrol, Detectives Barnes and Brown patrolled outside the Tiger Mart, a store in the Gilpin Court neighborhood. (ECF No. 36, at 7:12–15.) Detective Barnes believed that he recognized a car parked in front of Tiger Mart from another case, and he ran the vehicle's license plate. (ECF No. 36, at 7:18–24.) After running the license plate, Detective Barnes learned that the vehicle was not the one he believed he recognized, and that it was instead registered to a "Larry Barnhart." (ECF No. 36, at 7:25–9:1.) Detective Barnes' search of the license plate also yielded a "hit" for an active arrest warrant for "Larry Barnhart" out of Henrico County.[9] (ECF No. 36, at 8:2–9:1.)

---

order existed.  Therefore[,] the validity of the [Capias] depends on whether the clerk had authority to do so.")).

Under Virginia law, circuit court clerks are permitted to issue arrest warrants. *See* Va. Code § 19.2-71(A) ("Process for the arrest of a person charged with a criminal offense may be issued by the judge, or clerk of any circuit court[.]"); *see also Shadwick v. City of Tampa*, 407 U.S. 345, 352 (1972) (holding that clerks of court may constitutionally issue warrants pursuant to state statutes granting such authority).

Nevertheless, the Court finds that Judge Lambert issued the Capias.  Although the Capias was signed by a deputy clerk, not by Judge Lambert, the deputy clerk who signed the Capias acted at Judge Lambert's direction.  Indeed, it was Judge Lambert who granted ACA Dorsey's request for the Capias, and it was Judge Lambert who issued an order, albeit unsigned, *directing* a Capias for Show Cause. (ECF No. 35-12, at 1.)  Although Judge Lambert's oral order granting ACA Dorsey's written request may not control, and her written order may have been defective, both indicate that it was Judge Lambert's decision—not the deputy clerk's—to issue the Capias.

[9] At the suppression hearing, Detective Barnes explained that when the system for running a license plate reveals a "hit," his screen "shows a lot of things," including the originating jurisdiction for the warrant, the base charge, and the date the warrant was issued. (ECF No. 36, at 18:16–23.)  It also includes demographic information for the person named in

Because the vehicle appeared unoccupied, Detectives Barnes and Brown waited until someone returned. (ECF No. 36, at 9:14–19.) While they waited, Detective Barnes "obtained a DMV photo of Mr. Barnhart" and looked Mr. Barnhart up in "LInX," a police database that records a person's encounters with police. (ECF No. 36, at 9:6–7, 10:9–25.)

Sometime later, a person resembling Mr. Barnhart's DMV photo exited the Tiger Mart and walked towards the vehicle. (ECF No. 36, at 9:20–10:4.) The person entered the driver's side of the vehicle, started the car, and pulled out of the Tiger Mart parking lot. (ECF No. 36, at 11:10–12.) Detectives Barnes and Brown followed the vehicle. (ECF No. 36, at 11:8–17.)

After observing the driver of the vehicle fail to stop at two stop signs, Detective Barnes initiated a traffic stop. (ECF No. 36, at 12:6–16.) The vehicle pulled over, and Detective Barnes approached the driver's side of the vehicle. (ECF No. 36, at 12:17–20; Body Cam, at 0:43–52.) Detective Barnes asked for the driver's name, and the driver responded that it was "Larry." (ECF No. 36, at 12:24–13:5; Body Cam, at 1:05.) Detective Barnes also asked for his driver's

---

the warrant, including the person's social security number and date of birth. (ECF No. 36, at 18:16–23.)

Detective Barnes' screen showed only that the Capias existed for Mr. Barnhart, and it did not reveal to Detective Barnes why the Capias was issued or what happened in Henrico Circuit Court to necessitate the warrant. (ECF No. 36, at 10:13–16.) To confirm that the Capias actually existed, Detective Barnes contacted officials in its issuing jurisdiction. (ECF No. 36, at 19:6–8.) To do so, he "ran" Mr. Barnhart's social security number through his police radio and contacted "Richmond Dispatch," which in turn contacted "Henrico Dispatch." Henrico officials then confirmed the Capias' existence through Henrico's "warrant desk" and communicated the same to Detective Barnes. (ECF No. 36, at 19:16–20:4.)

Detective Barnes testified that he had confirmation from the Henrico warrant desk that the Capias was active "before [he] left the scene," (ECF No. 36, at 21:14–15), but it is not clear at what point Detective Barnes contacted Richmond Dispatch to initiate this process, nor when the Henrico warrant desk confirmed the Capias' existence.

8

license, which the driver produced and identified him as "Larry Barnhart." (ECF No. 36, at 12:24–13:5; Body Cam, at 1:03–16.)

Detective Barnes asked Mr. Barnhart whether there were any firearms in the vehicle, and Mr. Barnhart said that there were not. (ECF No. 36, at 13:12–14; Body Cam, at 1:08–1:10) Detective Barnes asked Mr. Barnhart to exit the vehicle to show him his license plate, which Detective Barnes said was "obscured." (Body Cam, at 1:17.) Mr. Barnhart complied. (ECF No. 36, at 14:1–3; Body Cam, at 1:17–1:25.)

Once Mr. Barnhart exited the vehicle, Detectives Barnes and Brown "detain[ed] Mr. Barnhart in handcuffs." (ECF No. 36, at 14:4–6; Body Cam, at 1:27–1:48.) After the Detectives handcuffed Mr. Barnhart, Detective Barnes told Mr. Barnhart, "You got a warrant." (Body Cam, at 1:49–1:52.) Mr. Barnes asked what the warrant was for, and Detective Barnes explained that it "looks like you missed court for a robbery." (Body Cam, at 1:52, 2:17–2:19.)

As Detective Barnes explained to Mr. Barnhart that he had an outstanding warrant, Detective Barnes ran his hands over the front of Mr. Barnhart's jacket and felt a "a rigid object consistent with a firearm in his right coat pocket." (ECF No. 36, at 14:16–17; Body Cam, at 1:52.) Detective Barnes then "patted" that spot and confirmed "in [his] mind" that the object was a firearm. (ECF No. 36, at 15:3–4; Body Cam, at 1:52–1:54.)

Detective Barnes asked Mr. Barnhart if he had a concealed weapons permit, and Mr. Barnhart said something that Detective Barnes "couldn't quite understand." (ECF No. 36, at 15:6–8; Body Cam, at 1:55–2:00.) Detective Barnes then asked Mr. Barnhart if he was a felon, and Mr. Barnhart answered, "Yes." (ECF No. 36, at 15:8–9; Body Cam, at 2:00–2:03.)

Detective Barnes unzipped Mr. Barnes' right coat pocket and retrieved a Taurus revolver. (ECF No. 36, at 15:12–13; Body Cam, at 1:55–2:00.) Before Detectives Barnes and Brown took

Mr. Barnhart to the police station, Detective Barnes again explained to Mr. Barnhart that he had a warrant "out of Henrico," and Mr. Barnhart responded that he "thought [the court date] was on the twenty-something. . . . It's for restitution." (Body Cam, at 3:57–4:09; *see also* ECF No. 36, at 16:10–13.)[10]

On December 16, 2025, thirteen days after the Henrico Circuit Court issued the Capias and ten days after Mr. Barnhart was arrested, Judge Lambert signed and filed an order, identical to the Draft Order, ordering that a Capias to Show Cause be issued. (ECF No. 35-14, at 1.)

**B.    Procedural Background**

On January 6, 2026, a Grand Jury for the Eastern District of Virginia returned a one-count Indictment charging Mr. Barnhart with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1, at 1.) The same day, an arrest warrant was issued and Mr. Barnhart was arrested. (ECF Nos. 3, 5.) On January 8, 2026, Mr. Barnhart appeared before United States Magistrate Judge Mark R. Colombell for an initial appearance. (ECF No. 6.) On January 13, 2026, he appeared before United States Magistrate Judge Summer L. Speight for a detention hearing, (ECF Nos. 13, 14), and before this Court for an arraignment, (ECF No. 12).

On January 30, 2026, Mr. Barnhart filed the instant Motion to Suppress. (ECF No. 19). The United States responded, (ECF No. 24), and Mr. Barnhart replied, (ECF No. 28). On March 24, 2026, the Court held a hearing on the Motion. (ECF No. 35.) On March 31, 2026, both parties filed supplemental briefs. (ECF Nos. 37, 38.)

---

[10] In considering the Motion, the Court assumes that Mr. Barnhart was under arrest on the Capias, rather than under arrest as a result of his traffic violation or another offense, when Detective Barnes discovered the firearm. (*See* ECF No. 38, at 1–3 (capturing Mr. Barnhart's argument that the basis for his arrest was the Capias).) No party contends otherwise.

## II. Standard of Review

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a 'particular description of the place to be searched, and the persons or things to be seized,' and (3) be based 'upon probable cause, supported by Oath or affirmation.'" *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994) (internal brackets omitted) (quoting U.S. Const. amend. IV). Evidence seized pursuant to an invalid warrant is ordinarily suppressed under the exclusionary rule, meaning that the evidence "cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018) (quotation omitted).

However, the United States Supreme Court "recognized a good faith exception to that rule, under which evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." *Id.* (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)).

"The proponent of a motion to suppress has the burden of establishing that his [or her] own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *see also United States v. Bowman*, 106 F.4th 293, 300 (4th Cir. 2024) ("[T]he defendant bears the burden of proof on a motion to suppress."). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

11

### III. Analysis

Mr. Barnhart asks the Court to suppress the firearm recovered from his jacket pocket during the search incident to arrest because the Capias on which that arrest was predicated was deficient on two grounds: it was not supported by probable cause and it was not supported by oath or affirmation.[11] (ECF No. 19, at 3–7.)

As to probable cause, Mr. Barnhart argues that the Capias issued concerning his failure to appear for the December 2025 restitution review hearing was not supported by sufficient evidence that Mr. Barnhart violated Virginia Code § 18.2-456(A)(6),[12] the charging offense in the Capias. According to Mr. Barnhart, the Capias was unsupported by probable cause (1) because § 18.2-456(A)(6) does not apply to post-conviction proceedings, meaning his failure to appear for the restitution review hearing did not violate § 18.2-456(A)(6), (ECF No. 19, at 3–

---

[11] Mr. Barnhart does not contest that the arresting officers were entitled to search his person incident to his arrest without first obtaining a warrant. *See United States v. Lee*, No. 3:07-cr-307, 2007 WL 3306674, at *3 (E.D. Va. Nov. 6, 2007) ("A search incident to lawful arrest has long been recognized as an exception to the Fourth Amendment warrant requirement."); *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.").

[12] Virginia Code § 18.2-456 provides, in relevant part:

A. The courts and judges may issue attachments for contempt, and punish them summarily, only in the following cases:

\* \* \*

6. *Willful failure* to appear before any court or judicial officer as required *after having been charged with a felony offense* or misdemeanor offense[.]

Va. Code § 18.2-456(A)(6) (emphasis added).

12

4); and (2) because he did not receive notice of the restitution review hearing, meaning he did not *willfully* fail to appear for that hearing as required by § 18.2-456(A)(6), (ECF No. 19, at 4–5).

With respect to oath or affirmation, Mr. Barnhart contends that the Capias was wholly unsupported by an oath or affirmation as required by the Fourth Amendment, rendering the Capias invalid. (ECF No. 19, at 5–7.)

The United States largely does not dispute Mr. Barnhart's arguments with respect to probable cause and the oath or affirmation requirement. Instead, the United States asserts that the deficiencies in the Capias are "irrelevant" because the arresting officers acted in good-faith reliance on the Capias such that the good-faith exception to the exclusionary rule applies and suppression would not be appropriate. (ECF No. 24, at 2–3.)

Rather than address whether probable cause supported the Capias or whether the Capias was deficient because it lacked oath or affirmation, the Court "'proceed[s] immediately to a consideration of the officers' good faith'" reliance on the Capias. *United States v. Bynum*, 293 F.3d 192, 194–95 (4th Cir. 2002) (quoting *Leon*, 468 U.S. at 925); *United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994) (noting that under *Leon*, "a reviewing court may proceed to the good faith exception without first deciding whether [a] warrant was supported by probable cause"); *see United States v. Warren*, No. 20-4076, 2022 WL 72723, at *3 (4th Cir. Jan. 7, 2022) (declining to decide whether the lack of signature on a warrant renders a warrant constitutionally defective and instead resolving the issue under the good-faith exception). Applying the good-faith exception, the Court concludes that Detective Barnes acted in good-faith reliance on the Capias, and the Court will not suppress the fruits of Mr. Barnhart's arrest or the search of his person.

**A.      The Arresting Officers Acted in Good-Faith Reliance on the Capias, Meaning Suppression of the Firearm Recovered from Mr. Barnhart would be Inappropriate**

The United States argues that even if the Capias was unsupported by probable cause or by oath or affirmation, the arresting officers acted in good faith on the Capias. (ECF No. 24, at 5–7.) The Court agrees.

**1.      Legal Standard:  The Good-faith Exception to the Exclusionary Rule**

Even if a warrant is not supported by probable cause, "the evidence obtained will not be suppressed if the executing officer relied on the warrant in objectively reasonable good faith." *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (citing *Leon*, 468 U.S. at 922–23). "[T]he proper test of an officer's good faith is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (quoting *Leon*, 468 U.S. at 922 n.23).

In *United States v. Leon*, the Supreme Court "explained that an officer could not be found to have acted with 'objective reasonableness,'" *Bynum*, 293 F.3d at 195, thereby barring the application of the good-faith exception, in the following circumstances:

> (1) where the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth";
>
> (2) "where the issuing magistrate wholly abandoned his [or her] judicial role";
>
> (3) where "a warrant based on an affidavit [is] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; or
>
> (4) where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Leon*, 468 U.S. at 923 (citations omitted)).

14

### 2.    The Court Will Not Suppress the Firearm Because None of the *Leon* Exceptions are Present Here

The United States argues that the good-faith exception to the exclusionary rule applies because the arresting officers reasonably relied on the Capias to arrest Mr. Barnhart and then conduct the search incident to arrest.  Mr. Barnhart, in turn, concedes that the arresting officers "were entitled to assume that the [Capias] they learned of was based on probable cause." (ECF No. 28, at 6–7 (quotation omitted).)  Instead, relying primarily on *Whiteley v. Warden*, 401 U.S. 560 (1971), Mr. Barnhart maintains that the good-faith exception does not apply here because of problems "upstream" of those officers:  the actions of Judge Lambert and the deputy court clerk. (ECF No. 28, at 7–10.)

Finally, Mr. Barnhart contends that, "[i]f required to categorize the reason the good faith exception should not apply here" within the four circumstances identified in *Leon*, the second, third, and fourth of *Leon*'s "exceptions" exist here such that the good faith exception does not apply and suppression is appropriate.[13]

The Court begins by considering Mr. Barnhart's argument with respect to *Whiteley v. Warden*, then proceeds to consider each of the three *Leon* "exceptions" Mr. Barnhart invokes. For the reasons articulated below, the Court finds that *Whiteley* is inapposite, and that this case

---

[13] Relying on *United States v. Lyles*, 910 F.3d 787 (4th Cir. 2018), Mr. Barnhart argues that it is "not entirely clear that [*Leon*'s] list of four categories is an exhaustive or formal list," meaning the Court need not "formally categoriz[e]" this case under one of the four *Leon* exceptions. (ECF No. 38, at 6.)

But in *Lyles*, the United States Court of Appeals for the Fourth Circuit affirmed a district court opinion that *did* discuss *Leon*'s four exceptions. *See United States v. Lyles*, No. TDC-17-0039, 2017 WL 5633093, at *5–6 (D. Md. Nov. 20, 2017).  Courts within the Fourth Circuit and in this District overwhelmingly consider *Leon*'s "exceptions" as guiding the good-faith-exception inquiry.  The Court will not depart from that process here.

does not fit within *Leon*'s final three "exceptions" to the good-faith exception. The Court will therefore deny the Motion.

### a.    *Whiteley v. Warden* **is Inapposite**

In *Whiteley v. Warden*, a county sheriff in Wyoming, acting on a tip, signed a complaint charging the defendant with breaking and entering into two businesses. A magistrate issued a warrant for the defendant's arrest. 401 U.S. 560, 562–63 (1971). The sheriff then issued a message on a state-wide radio network describing the suspect, his car, and the property taken. *Id.* at 563–64. Relying on this information, an officer in nearby Laramie County arrested the suspect and searched his car. *Id.* The Supreme Court later found that the complaint failed to establish probable cause, and that the evidence obtained as a result of the suspect's unconstitutional arrest should have been suppressed at trial. *Id.* at 564–65, 568–69. In so finding, the Court noted:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. *Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.*

*Id.* at 568 (emphasis added).

Mr. Barnhart relies on *Whiteley*, and the foregoing passage in particular, to argue that suppression of the firearm is appropriate despite the good-faith exception. (ECF No. 28, at 6–7.) Like the Laramie County officer who arrested the defendant in *Whiteley* in reliance on the sheriff's radio message, the parties agree that the arresting officers here reasonably relied on the Capias to arrest Mr. Barnhart. But, just as the defendant's arrest in *Whiteley* "[could not] be insulated from challenge by the decision of the instigating officer to rely on fellow officers to

make the arrest," Mr. Barnhart argues that the "clerk's decision to issue [the] [C]apias in clear violation of the Fourth Amendment 'cannot be insulated from challenge' just because the [Henrico Circuit Court] relied on other 'officers to make the arrest.'" (ECF No. 28, at 7.)

*Whiteley* pre-dates *Leon* by over a decade, and as the Supreme Court has recognized, the validity of its holding with respect to suppression is questionable. In *Arizona v. Evans*, the Supreme Court explained:

> Although *Whiteley* clearly retains relevance in determining whether police officers have violated the Fourth Amendment, its precedential value regarding application of the exclusionary rule is dubious. In *Whiteley,* the [Supreme] Court treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule to evidence secured incident to that violation. Subsequent case law has rejected this reflexive application of the exclusionary rule. . . . [L]ater cases have emphasized that the issue of exclusion is separate from whether the Fourth Amendment has been violated, and exclusion is appropriate only if the remedial objectives of the rule are thought most efficaciously served[.]

514 U.S. 1, 13–14 (1995) (internal citations omitted).

Mr. Barnhart emphasizes the Supreme Court's conclusion that *Whiteley* "clearly retains relevance in determining whether police officers have violated the Fourth Amendment." (ECF No. 28, at 8 (quoting *Evans*, 514 U.S. at 13).) But Mr. Barnhart elides the Supreme Court's clear admonition that "the issue of exclusion [of evidence] *is separate from whether the Fourth Amendment has been violated.*" *Evans*, 514 U.S. at 13. Indeed, Mr. Barnhart does not cite *Evans'* finding that "[s]ubsequent case law has rejected [*Whiteley's*] reflexive application of the exclusionary rule" nor the Supreme Court's characterization of *Whiteley's* precedential value with respect to suppression as "dubious." *Id.* As *Evans* explained, the proper inquiry for the purposes of whether "exclusion is appropriate" is whether "the remedial objectives of the [exclusionary] rule are thought most efficaciously served." *Id.* at 13–14. And to conduct that inquiry, the Court must examine whether the good-faith exception applies, or whether the four

17

*Leon* exceptions to the good-faith exception govern Mr. Barnhart's arrest. *See Leon*, 468 U.S. at 908 ("[T]he application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served.") (quotation omitted). That inquiry is in keeping with the "[s]ubsequent case law" cited by *Evans*.

Because the Court's good-faith inquiry is governed by *Leon* and its progeny, rather than by *Whiteley*, Mr. Barnhart's reliance on *Whiteley* founders. The Court instead considers whether any of the *Leon* exceptions invoked by Mr. Barnhart govern his arrest and require suppression of the firearm. They do not.

### b.     The Second *Leon* Exception Does Not Apply Because There is No Evidence that Judge Lambert Was Not Neutral or Detached When She Issued the Capias

Mr. Barnhart argues that the second *Leon* exception to the good-faith exception applies because Judge Lambert "uncritically accepted the Commonwealth[']s Attorney's unsworn assertion that Mr. Barnhart had notice [of the December 2025 restitution review hearing], despite written orders in the record of the case establishing that he had not appeared at the prior hearing."[14] (ECF No. 38, at 5; *see also* ECF No. 28, at 8–9.)

The second *Leon* exception to the good-faith exception applies where the issuing judge or magistrate "wholly abandoned his [or her] judicial role *in the manner condemned in Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319 [(1979)]." *Leon*, 468 U.S. at 923 (emphasis added). In *Lo–Ji Sales*, an investigator for the New York State Police sought a warrant to search an adult bookstore and presented a Town Justice with two allegedly obscene films along with an affidavit indicating that "similar" films were present in the bookstore. *Lo–Ji Sales*, 442 U.S. at 321. After

---

[14] The Court considers here whether Judge Lambert—not the deputy clerk—was neutral and detached. *See supra* Note 8.

viewing the films, the Town Justice issued a warrant authorizing a search of the bookstore and seizure of the films, as well as other items possessed in violation of New York law. *Id.* at 321–22. The warrant did not list the other items to be seized.

Instead, the Town Justice accompanied law enforcement officers on a search of the bookstore, examined the materials at the bookstore to assess their obscenity, and authorized the seizure of the items deemed obscene. *Id.* at 322–24. In finding that the warrant was deficient, the Supreme Court explained that

> [t]he Town Justice did not manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application for a search and seizure. We need not question the subjective belief of the Town Justice in the propriety of his actions, but the objective facts of record manifest an erosion of whatever neutral and detached posture existed at the outset. He allowed himself to become a member, if not the leader, of the search party which was essentially a police operation. Once in the store, he conducted a generalized search under authority of an invalid warrant; *he was not acting as a judicial officer but as an adjunct law enforcement officer.*

*Id.* at 326–27 (emphasis added).

There is no evidence that Judge Lambert, in issuing the Capias, wholly abandoned her judicial role *in the manner* of the issuing authority in *Lo–Ji Sales.* Indeed, Mr. Barnhart does not argue that Judge Lambert was not neutral or detached, or that she acted "not [] as a judicial officer but as an adjunct law enforcement officer." *Lo–Ji Sales*, 442 U.S. at 327. Without evidence or argument to this effect, the Court cannot find that *Leon*'s second exception to the good-faith exception applies in these circumstances.[15] The Court will not suppress the firearm under the second *Leon* exception.

---

[15] In several cases, the Fourth Circuit has defined this *Leon* exception as encompassing cases where "the magistrate acted as a rubber stamp for the officers and so 'wholly abandoned' his [or her] detached and neutral judicial role.'" *United States v. Williams*, 548 F.3d 311, 317 (4th Cir. 2008) (quoting *Bynum*, 293 F.3d at 195); *United States v. Wilhelm*, 80 F.3d 116, 121–23 (4th Cir. 1996). But in several more recent cases, the Fourth Circuit has indicated that arguments

19

     **c.**      **The Third *Leon* Exception Does Not Apply Because the Capias Was Not So Lacking in Indicia of Probable Cause as to Render <u>Official Belief in its Existence Entirely Unreasonable</u>**

*Leon* also instructs that the good-faith exception does not apply where a warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923 (quotation omitted). Mr. Barnhart argues that this *Leon* exception to the good-faith exception applies because there was "no supporting affidavit at all, and no sworn statement of any kind, nor personal knowledge by the issuing authority that could substitute for the oath or affirmation requirement" setting forth the basis for probable cause in the Capias. (ECF No. 38, at 5.)

There is no dispute that the Capias was not accompanied by an affidavit. But this fact alone does not mean that the present circumstances necessarily fall within *Leon*'s third exception to the good-faith exception. As the United States Court of Appeals for the Fourth Circuit has held, "the Fourth Amendment does not require that the basis for probable cause be established in

---

with respect to a magistrate's "rubber stamp" of an affidavit essentially "recast [a defendant's] argument that no officer could reasonably rely on the warrant because there was an insufficient basis for a probable cause finding"—that is, the prohibition on a magistrate's "rubber stamping" an affidavit implicates the third, rather than the second, *Leon* exception. *United States v. Andrews*, 577 F.3d 231, 240 (4th Cir. 2011); *United States v. Doyle*, 650 F.3d 460, 469–70 (4th Cir. 2011) (finding that where the defendant challenged whether the affidavit set forth probable cause but did "not contend that the state magistrate issued an open-ended warrant or executed the search alongside law enforcement officers as did the Town Justice" in *Lo–Ji Sales*, the third *Leon* exception applied).

Here, Mr. Barnhart argues that Judge Lambert "uncritically" accepted the Commonwealth's Attorney's assertion that Mr. Barnhart had notice of the hearing despite written orders in the record suggesting otherwise. (ECF No. 38, at 5.) As in *Andrews* and *Doyle*, Mr. Barnhart's argument amounts to a challenge to Judge Lambert's probable cause determination, rather than asserting that Judge Lambert abandoned her detached, neutral role as in *Lo–Ji Sales*. The Court considers this argument with respect to the third *Leon* exception analyzed below.

a written affidavit." *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994). And probable cause may be based on "sworn, unrecorded oral testimony." *Id.* Thus, that the Capias was not accompanied by an affidavit does not mean that it was so lacking in indicia of probable cause that it could not be reasonably relied upon.

Indeed, despite the lack of a sworn affidavit, the circumstances here indicate that the Capias was not so lacking in indicia of probable cause as to render official belief on it entirely unreasonable. During the restitution review hearing on December 3, 2025, ACA Dorsey told Judge Lambert that it "looks like that the *parties*"—presumably including Mr. Barnhart—"were present back on December 5th of [2023]" when the follow-up hearing date was selected. (ECF No. 35-11, at 3:11–16.) This representation provided Judge Lambert with probable cause[16] to find that Mr. Barnhart was at the prior restitution review hearing, and to reasonably determine that Mr. Barnhart had notice of the December 2025 restitution review hearing.[17]

---

[16] ACA Dorsey was mistaken when he asserted that Mr. Barnhart was present at the previous hearing. (*See* ECF No. 35-10, at 1 (noting that Mr. Barnhart "was not present" at the December 5, 2023 restitution review hearing).) But Mr. Barnhart does not allege that the statement made by ACA Dorsey was *deliberately false* such that the first *Leon* exception applies. *See Leon*, 468 U.S. at 923 ("Suppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth.") (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). (ECF No. 38, at 5.) Thus, that ACA Dorsey was mistaken does change this Court's analysis, nor does it impact the constitutionality of Judge Lambert's probable cause determination.

[17] The record does not indicate whether Judge Lambert reviewed records of the prior restitution review hearings, including Judge Harris' December 2023 order stating that Mr. Barnhart did *not* appear at the December 2023 hearing. The Court makes no factual finding with respect to the record reviewed by Judge Lambert.

However, even if Judge Lambert *did* review Judge Harris' December 2023 order concerning Mr. Barnhart's previous failure to appear, Judge Harris' prior order would not necessarily bar Judge Lambert's probable cause determination concerning Mr. Barnhart's failure to appear before her. Judge Harris previously noted that Mr. Barnhart failed to appear at the hearing where he would have learned of the date of the hearing before Judge Lambert. (ECF No.

To be sure, it is not clear whether, as a matter of law, ACA Dorsey's statement to Judge Lambert was made under "oath or affirmation," as required by the Fourth Amendment. But this fact does not change the Court's analysis for two reasons. First, while not strictly made "under oath," attorneys' representations to judges are expected to be truthful. *See* Va. Rule Prof'l Conduct 3.3(a)(1) (prohibiting lawyers from *knowingly* making false statements of fact or law to a tribunal); Va. Code § 8.01-271.1(C) ("An oral motion made by an attorney or party in any court of the Commonwealth constitutes a representation by him [or her] that (i) to the best of his [or her] knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law."). It was more than appropriate for Judge Lambert to credit ACA Dorsey's representation that Mr. Barnhart appeared at the December 2023 hearing and to grant his request for a Capias on that representation.

More importantly, while the lack of oath or affirmation could render the Capias defective—an issue this Court need not decide—it does not mean that the fruits of the search fall beyond the bounds of the exclusionary rule. Mr. Barnhart does not cite a single case, and this Court is not aware of any, finding that the good-faith exception does not apply to the fruits of a Capias supported by indicia of probable cause that is offered to a magistrate under reliable means, though perhaps not under oath or affirmation. *See, e.g.*, *Warren*, 2022 WL 72723, at *1–3 (declining to decide whether an unsigned *warrant* violated the Fourth Amendment and finding

---

35-10, at 1.) On that fact alone, the record could have been read to suggest that Mr. Barnhart, by virtue of his failure to appear at the December 2023 hearing, did not receive notice of his newly-scheduled hearing date. But Judge Harris, in that same order, directed the clerk to send a copy of his order to Mr. Barnhart *alerting* Mr. Barnhart to his upcoming court date before Judge Lambert. (ECF No. 35-10, at 1.) Thus, even if Judge Lambert had reviewed the most recent order on the record, her probable cause determination that Mr. Barnhart had notice of the December 2025 hearing could have been supported. Neither party makes any argument with respect to these facts.

22

that the good-faith exception applied).  Absent authority to the contrary, this Court cannot find

that the *Leon*'s third exception to the good-faith exception applies here.  The Court will not

suppress the firearm under the third *Leon* exception.[18]

### d.      The Fourth *Leon* Exception Does Not Apply Because the Capias Was Not Facially Deficient as Contemplated in *Leon*

Finally, the fourth *Leon* exception provides that the good-faith exception does not apply

where a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched

or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Leon*, 468 U.S. at 923.  Mr. Barnhart invokes this exception too, arguing that "the [C]apias

invoked, on its face, a statute that by law cannot apply to failures to appear at restitution review

hearings." (ECF No. 38, at 5–6.)

Mr. Barnhart does not argue that the Capias lacked particularity.  Instead, his argument

amounts to a restatement of his contention that the Capias was unsupported by probable cause:

he contends that because Virginia Code § 18.2-456(A)(6) governs failures to appear after a

---

[18] Mr. Barnhart asserts that a "personal knowledge" exception to the oath or affirmation requirement exists where a court issues a warrant for failure to appear. (ECF No. 19, at 5–6.) Citing a single case from the United States District Court for the District of Connecticut, Mr. Barnhart explains that "it appears likely that warrants for failure to appear can usually be issued without oath or affirmation, because the [c]ourt who ordered the party to appear has personal knowledge that the party was notified of the hearing, which obviates the need for sworn testimony or an affidavit." (ECF No. 19, at 5–6 (citing *Milner v. Duncklee*, 460 F. Supp. 2d 360 (D. Conn. 2006).)  Nevertheless, Mr. Barnhart argues that any "personal knowledge" exception would not apply here because the party who ordered Mr. Banhart to appear at the December 2025 hearing—Judge Harris—was different than the party who presided over the December 2025 hearing—Judge Lambert. (ECF No. 19, at 5–6.)  Thus, he concludes, the oath or affirmation requirement *does* apply here.

Regardless of whether a "personal knowledge" exception to the oath or affirmation requirement exists, or whether it applies here, as the Court explains above, Mr. Barnhart fails to demonstrate that any such defect would be beyond the bounds of the exclusionary rule and would require the Court to suppress the firearm as a fruit of the search.

defendant "ha[s] been *charged* with a felony offense or misdemeanor," and Mr. Barnhart was not

*charged* with a felony offense or misdemeanor at the restitution review hearing, Mr. Barnhart did

not violate § 18.2-456(A)(6) in failing to appear for his restitution review hearing.  (ECF No. 19,

at 3–4.)

The Court need not decide here whether § 18.2-456(A)(6) covered Mr. Barnhart's

conduct because merely including the charging statute on the face of the Capias does not render

the Capias *facially deficient* in the manner contemplated by *Leon*.  *Leon*, 468 U.S. at 923

(explaining that a warrant is facially deficient where it "fail[s] to particularize the place to be

searched or the things to be seized"); *see, e.g.*, *United States v. Grandy*, No. 5:21-cr-00044, 2022

WL 10656674, at *9 (W.D.N.C. Oct. 18, 2022) ("[T]he warrants were not facially deficient.

They describe with specificity the subject of the warrant, the data to be searched and collected,

and the items to be seized.").  Indeed, Mr. Barnhart does not cite a single case invoking *Leon*'s

fourth exception based on a challenge that the defendant did not violate the charging statute, nor

is the Court aware of any.  After all, the good-faith exception is rooted in the belief that "[i]t is

the judicial officer's responsibility to determine whether probable cause exists to issue a warrant

and, in the ordinary case, police officers cannot be expected to question that determination."

*Illinois v. Krull*, 480 U.S. 340, 349 (1987).  To find that the good-faith exception applies because

the Capias was facially deficient in that it identified "on its face" a statute Mr. Barnhart contends

he did not violate would incentivize officers to question judicial officers' determinations.  The

Court declines to make that finding.  The Capias was not facially deficient, and *Leon*'s fourth

exception to the good-faith exception does not apply.  The Court will not suppress the firearm

under the fourth *Leon* exception.

### e.    The Exclusionary Rule's Purpose Underscores This Court's Decision to Deny the Motion

"The Fourth Amendment's 'exclusionary rule is designed to deter police misconduct *rather than to punish the errors of judges and magistrates.*'" *Warren*, 2022 WL 72723, at *3 (emphasis in original) (quoting *Leon*, 468 U.S. at 916)); *see also Evans*, 514 U.S. at 14–15 ("Application of the *Leon* framework supports a categorical exception to the exclusionary rule for clerical errors of court employees."). "To trigger the exclusionary rule, *police misconduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable* that such deterrence is worth the price paid by the justice system. . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *United States v. Herring*, 555 U.S. 135, 144 (2009) (emphasis added). Thus, in considering whether to invoke the good-faith exception to the exclusionary rule, Courts must consider "'whether a reasonably well-trained *officer* would have known that the search was illegal despite the magistrate's authorization.'" *Warren*, 2022 WL 72723, at *3 (emphasis added) (quoting *Leon*, 468 U.S. at 922 n.23).

The facts at bar present the quintessential example of when suppression would fail to serve the exclusionary rule's purpose. Mr. Barnhart—fairly and accurately—repeatedly concedes that the arresting officers acted reasonably and in accordance with the law in relying on the Capias to arrest Mr. Barnhart. (*See, e.g.*, ECF No. 28, at 6 ("Mr. Barnhart does not find any fault with the conduct of the arresting officer[s], or allege any impropriety on their part. The problem was upstream of those officers.").) Indeed, the record does not indicate that any police misconduct occurred, nor does it suggest that granting the Motion would serve to deter future police misconduct. Detective Barnes discovered the outstanding Capias through a routine license plate scan, took steps to confirm the vehicle's owner and driver was the same person

25

named in the Capias, and verified the Capias with the Henrico warrant desk. By all accounts, Detective Barnes followed routine, proper procedure in relying on the Capias.

Moreover, the deficiencies Mr. Barnhart identifies with the issuance of the Capias, including the fact that Judge Lambert failed to sign the Draft Order accompanying the Capias, are akin to clerical errors. The Supreme Court and the Fourth Circuit have routinely held that suppression is inappropriate based on clerical errors fall and have applied the good-faith exception. For example, in *Arizona v. Evans*, the Supreme Court applied the good-faith exception and held that marijuana seized as a result of a defendant's arrest on an arrest warrant that had been quashed prior to his arrest, but record of which still remained in the police computer system, need not be suppressed. 514 U.S. at 4–5, 14–15. Similarly, in *United States v. Herring*, the Supreme Court again applied the good-faith exception and held that evidence need not be suppressed after it was recovered following a defendant's arrest on a warrant that had been recalled where the police computer database did not reflect the recall. 555 U.S. 135, 137–38, 147–48 (2009). And in *United States v. Brown*, the Fourth Circuit concluded that the good-faith exception applied to a gun, narcotics, and money seized as a result of a defendant's arrest on a warrant for a failure to appear that had been recalled, but where the officer called dispatch to confirm the validity of the warrant, which dispatch confirmed. 618 F. App'x 743, 744–45 (4th Cir. 2015). Relying on *Herring*, the *Brown* court explained that the arresting officer "proceeded reasonably" in arresting the defendant after confirming the warrant's validity. *Id.*

Here, as in *Evans*, *Herring*, and *Brown*, any "upstream" clerical error by Judge Lambert or the deputy clerk in issuing the Capias does not preclude operation of the good-faith exception in this case. Rather, Mr. Barnhart's complaints with respect to the Capias stem from defects in its issuance—not from the officers' reliance on that warrant. The officers reasonably relied on

26

the Capias to arrest Mr. Barnhart, meaning the firearm seized as a result of that arrest need not be suppressed.

## IV. Conclusion

For the foregoing reasons, the good-faith exception to the exclusionary rule applies. The Court will deny the Motion and will not suppress the firearm seized as a result of Mr. Barnhart's arrest on the Capias. (ECF No. 19.)

An appropriate Order shall issue.

Date: 4/24/26
Richmond, Virginia

/s/
M. Hannah Lauck
Chief United States District Judge

27